UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| C.S. SEWELL, M.D. P.C. and ) | |
| CHRISTOPHER SEWELL, M.D., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | NO. 2:17-cv-00062 |
| v. ) | CHIEF JUDGE CRENSHAW |
| ) | |
| AMERIGROUP TENNESSEE, INC. ) | |
| d/b/a AMERIGROUP COMMUNITY ) | |
| CARE, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION

Christopher Sewell, M.D. ("Dr. Sewell"), and his medical practice C.S. Sewell, M.D. P.C. (together "Sewell"), bring this action against Amerigroup Tennessee, Inc. d/b/a Amerigroup Community Care ("Amerigroup") for declaratory and injunctive relief, as well as damages, alleging violations of the Sherman Antitrust Act, 42 U.S.C § 1983, the United States and Tennessee Constitutions, and various Tennessee state laws. Before the Court is Amerigroup's Motion to Dismiss. (Doc. No. 43.) As explained below, the motion will be granted in part and denied in part. Before proceeding, the Court notes that, despite the litany of issues presented in this case, at heart, the matter is a simple billing dispute.

### I. Factual Allegations

Dr. Sewell provides primary care medical services to patients in Jamestown, Tennessee. (Doc. No. 42 at 1.) A significant portion of Dr. Sewell's patient pool includes persons who are participants in TennCare, Tennessee's Medicaid program. (Id. at 2-3.) Dr. Sewell provides his patients, including TennCare patients, with a variety of preventive and primary care services, including allergy care and allergen immunotherapy. (Id. at 3.) Moreover, in order to administer

these allergy care services, Dr. Sewell contracts with United Allergy Services ("UAS"), which provides auxiliary personnel to assist him in performing certain ancillary allergy services such as application of the skin-prick test. (Id. at 6.)

Defendant Amerigroup operates as a health insurance and managed care organization ("MCO") that is authorized to arrange for the provision and reimbursement of healthcare services provided to patients enrolled in TennCare. (Id. at 2.) Prior to 2016, Dr. Sewell submitted claims for reimbursement for allergy-related services that he provided to TennCare patients, and Amerigroup promptly paid those allergy-related reimbursement claims. (Id. at 5.) However, starting in 2016, Amerigroup began denying allergy-related claims Dr. Sewell submitted for reimbursement. (Id.) Sewell alleges that Amerigroup, in concert with its affiliates, began systematically rejecting reimbursement for primary care physicians who provided allergy-related services with the help of UAS. (Id. at 7.) In conjunction with these systematic reimbursement denials, Amerigroup also opened an investigation into Dr. Sewell. (Id.) Sewell alleges that (1) Amerigroup launched the investigation to find a pretext to support its denial of the allergy care reimbursement claims; and (2) Amerigroup communicated with its corporate parent, Anthem, Inc., and other affiliates to develop such a pretext.[1] (Id. at 7-8.) In pursuit of this effort, Amerigroup relied upon Office of Inspector General ("OIG") Advisory Opinion No. 11-17 (the "Opinion"), which questioned whether the provision of allergy related medical services by primary care physicians, like Dr. Sewell, amounted to improper "inappropriate use of allergy services." (Id. at 8.)

---

[1] The Court takes judicial notice of Anthem Inc.'s 2017 Annual Report (Doc. No. 44-1), which states that Amerigroup and its affiliates are subsidiaries of Anthem, Inc. See Campbell v. Nationstar Mortg., 611 F. App'x 288, 291 (6th Cir. 2011) ("In addition to the allegations in the complaint, [the Court] may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice.")

Sewell alleges that, after internal discussions and communications with other Tennessee MCOs, Amerigroup justified its reimbursement denials on the basis that Dr. Sewell's allergy-related services and contract with UAS violated the Opinion. (Id.) Moreover, in September 2016, Sewell alleges that Amerigroup attempted to convince its MCO competitors, United Healthcare ("United") and BlueCare, to adopt this same position regarding eliminating reimbursement for allergy testing or immunotherapy at the primary care level. (Id. at 9.) Sewell alleges that Amerigroup did so (1) during a Healthcare Fraud Working Group meeting; (2) in a meeting at BlueCare's office in Chattanooga; and (3) in a subsequent monthly coordination call between the MCOs. (Id.)

According to the Amended Complaint, Amerigroup met with TennCare in September 2016 and discussed its concerns regarding Dr. Sewell and other primary care physicians offering allergy services in conjunction with UAS. (Id.) Sewell alleges that, through its actions, Amerigroup placed considerable pressure on primary care physicians offering these allergy services, successfully forcing at least one primary care provider to stop working with UAS and cease billing for such services. (Id. at 10.) In addition to the above-referenced conduct, another part of this alleged pressure included Amerigroup's manipulation of the reimbursement appeals process. (Id. at 10-11.) Sewell appealed each of the denied allergy care reimbursement claims through the normal appeals process, but Amerigroup (1) initially never responded; and (2) incorrectly stated in its appeals response that the reimbursement denials were based on Dr. Sewell's failure to obtain written approval before subcontracting the provision of the allergy-related services to UAS. (Id. at 11.) Dr. Sewell refuted Amerigroup's claim that he subcontracted the provision of these allergy-related medical services to UAS, arguing that UAS only provided certain services that were ancillary to the allergy treatments. (Id. at 12.)

Around this same period of time, Amerigroup allegedly began reaching out to board-certified allergists, seeking a consensus on a "standard of care" that would recommend primary care providers cease providing allergy testing and allergy immunotherapy and reserve those services to specialists. (Id.) Sewell alleges that, in March 2017, Amerigroup again met with TennCare to discuss terminating contracts with primary care physicians using UAS, based on the alleged "quality risk" associated with primary care physicians, rather than allergists, providing allergy care. (Id.) TennCare voiced reservations about consequential network deficiencies that could arise from the proposed terminations, as board-certified allergists were not prevalent its network (specifically, the closest allergist to Dr. Sewell was 90 to 100 miles away). (Id. at 13.) At a subsequent meeting in April 2017, Amerigroup decided to defer termination. (Id.) In the meantime, Amerigroup allegedly continued its reimbursement denials, maintaining that Dr. Sewell's allergy treatments were essentially being performed by UAS under an undisclosed subcontract without prior approval from Amerigroup and TennCare. (Id.)

Despite Amerigroup's alleged efforts, including the sharing of information with other MCOs and board-certified allergists, TennCare ultimately decided not to take any adverse action with respect to Dr. Sewell's continued provision of allergy care. (Id. at 14.) Thereafter, in June 2017, Dr. Sewell, along with another Tennessee primary care provider, made a complaint to the Tennessee Department of Commerce and Insurance ("TDCI") regarding Amerigroup's conduct. (Id.) Subsequently, before formally responding to the TDCI complaint, Amerigroup sent Dr. Sewell a letter, detailing his alleged reimbursement violations, and threatening sanctions, including automatically recouping all previously paid allergy care claims and terminating him from the Amerigroup network. (Id. at 15.) Amerigroup's letter formed the basis for a second complaint by Dr. Sewell to the TDCI in August 2017. (Id.) In September 2017, in response to Dr. Sewell's

4

complaints, the TDCI informed Dr. Sewell that he was free to pursue his own legal and contractual remedies outside of the administrative process. (Id. at 16.)

Sewell alleges that, as a result of Amerigroup's actions, it suffered damages and lost the ability to treat Amerigroup patients with allergy problems. (Id. at 17.) Sewell also claims that consumers have been harmed because there are no available alternatives for certain necessary healthcare services in North Central Tennessee, including allergy testing and immunotherapy. (Id.) Sewell raises state law claims for breach of contract, violation of Tennessee's Prompt Payment Act, and tortious interference with a business relationship. (Id. at 18-23.) Moreover, Sewell raises a Sherman Antitrust Act claim, asserting that Amerigroup combined, conspired or attempted to conspire with competitor MCOs and board-certified allergists to restrict competition for allergy testing and immunotherapy services in North Central Tennessee and other areas within Tennessee. (Id. at 23.) Finally, Sewell raises claims under the Declaratory Judgment Act, 42 U.S.C. § 1983, and the U.S. and Tennessee Constitutions. (Id. at 26-30.)

## II. **Standard of Review**

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Id. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Id. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Id. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Id. at 679. A legal conclusion couched as a factual allegation need not be accepted as true

on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010).

### III. Analysis

#### A. Sherman Antitrust Act Claim

Amerigroup first moves to dismiss Sewell's Sherman Antitrust Act claim, arguing that Sewell fails to (1) allege an actual agreement or concerted action to restrain trade; (2) define the relevant product or geographic market implicated by the alleged anticompetitive conduct; and (3) establish an antitrust injury. (Doc. No. 44 at 9-20.) Sewell responds that there are sufficient facts, as set out in the Amended Complaint, demonstrating that Amerigroup engaged in a conspiracy to restrain the provision of allergy services in North Central Tennessee. (Doc. No. 56 at 13-23.)

Section One of the Sherman Act, 15 U.S.C. § 1, prohibits unreasonable contracts, combinations, and conspiracies in restraint of trade. Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007). To state a Section One claim, a plaintiff must plead more than a restraint of trade; it must plead an agreement in restraint of trade. Twombly, 550 U.S. at 553 ("[T]he crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."). An agreement, either tacit or express, may ultimately be proven either by direct evidence of communications between the defendants or by circumstantial evidence of conduct that, in the context, negates the likelihood of independent action and raises an inference of coordination. Brown v. Pro Football, Inc., 518 U.S. 231, 241 (1996).

When asserting direct evidence of an agreement "these allegations must be specific enough to establish the relevant who, what, where, when, how or why." Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 445 (6th Cir. 2012). Stray remarks speaking directly of agreement are insufficient

6

for purposes of a motion to dismiss. In re Travel Agent Comm'n Antitrust Litig., 583 F.3d 896, 903 (6th Cir. 2009) (quoting Twombly, 550 U.S. at 564). The relevant question when considering circumstantial evidence of a conspiracy is "[d]o the factual allegations point to nothing more than parallel conduct of the sort that is the product of independent action, or do they plausibly raise an inference of unlawful agreement." Erie Cty., Ohio v. Morton Salt, Inc., 702 F.3d 860, 869 (6th Cir. 2012).

Sewell stops short of directly alleging that Amerigroup, other MCOs, and board-certified allergists agreed with one another to exclude primary care physicians from providing allergy testing and immunotherapy services. Sewell alleges, in pertinent part, that Amerigroup (1) "attempted to convince" United Healthcare and BlueCare (its competitor MCOs) to adopt the same position regarding eliminating reimbursement for allergy testing and immunotherapy at the primary care level; and (2) met with the competitor MCOs at several junctures (on conference calls, at BlueCare's office, at a workgroup) to "attempt to persuade" them to adopt this position. (Doc. No. 42 at 9.) Sewell's most direct allegation on the issue is that Amerigroup contacted competitor MCOs, board-certified allergists, and third parties in an "attempt to persuade, entice, or coerce them not to do business with Dr. Sewell or other primary care physicians, or to fix prices to competitively disadvantage them to discourage competition in the market." (Id. at 24.) Because Sewell does not directly or indirectly allege facts from which to infer an actual agreement between Amerigroup, other MCOs (United Healthcare and BlueCare), and board-certified allergists, the Court concludes that his allegations are legally insufficient to establish the "relevant who, what, where when, how or why" necessary to proceed on a direct evidence theory. Carrier Corp., 673 F. 3d at 445.

7

The Court must therefore consider whether Sewell has alleged sufficient circumstantial facts that, in context, negate the likelihood of independent action and raise an inference of coordination. Erie Cty., Ohio, 702 F.3d at 868. The Court is also not convinced that Sewell has alleged sufficient circumstantial facts to plausibly raise an inference of an unlawful agreement. In essence, Sewell has alleged that Amerigroup (1) created a pretext, in the form of the Opinion and other safety concerns, to exclude primary care physicians from providing allergy medical services; and (2) shared this pretextual information with its MCO competitors (United and BlueCare) and TennCare in an attempt to persuade them to adopt this position. (See Doc. No. 42 at 8-17.) However, there are no circumstantial allegations regarding the results of these efforts, namely, whether United and BlueCare adopted the position urged by Amerigroup. There are no allegations that (1) United and BlueCare actually ceased reimbursement for allergy medical services provided by primary care physicians; (2) TennCare took any action on the issue; or (3) the board-certified allergists' "standard of care" was ever actually promulgated. Without any indication that Amerigroup's alleged actions resulted in Amerigroup, United, and BlueCare adopting the same position regarding reimbursement, the Court is prevented from making an inference that an unlawful agreement was actually reached. Erie Cty., Ohio, 702 F.3d at 869.

To be sure, Sewell alleges a host of actions on the part of Amerigroup supporting its own decision to cease reimbursement. In its response to Amerigroup's motion to dismiss, Sewell again focuses on Amerigroup's actions, such as its use of the Opinion to deny Dr. Sewell reimbursement, its "abnormal behavior" in denying reimbursement appeals, and its inconsistent reasons for denying reimbursement. Nonetheless, again, what is missing from Sewell's Amended Complaint, and its response, is any allegation or circumstantial evidence that its efforts in enlisting board-certified allergists, the competitor MCOs or TennCare were actually successful and resulted in the

8

cessation of reimbursement activity among the various parties. Accordingly, because the Court cannot plausibly draw an inference that an unlawful agreement was reached, Sewell's Sherman Antitrust Act claim will be dismissed.

### B. 42 U.S.C. § 1983 Claim

Amerigroup next contends that Sewell's 42 U.S.C. § 1983 claim fails because it does not qualify as a state actor. (Doc. No. 44 at 22.) Amerigroup argues that, whether it or its actions are viewed under the public function, state compulsion, nexus, or entwinement tests, there is no question that it is not a state actor. (Id. at 22-27.) Amerigroup also asserts that, even if it qualifies as a state actor, Sewell does not have a federal enforceable right under § 1983. (Id. at 27-30.)

"A § 1983 claim must satisfy two elements (1) the deprivation of a right secured by the Constitution or laws of the United States; and (2) the deprivation was caused by a person acting under color of state law." Ellison v. Garbarino, 48 F.3d 192, 194 (6th Cir. 1995). A plaintiff may not proceed under § 1983 against a private party "no matter how discriminatory or wrongful" the party's conduct. Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 50 (1999).

Nevertheless, there are circumstances under which private persons may, by their action, become "state actors" for § 1983 purposes. Tahfs v. Proctor, 316 F.3d 584, 590 (6th Cir. 2003). A "private party can fairly be said to be a state actor if: (1) the deprivation complained of was 'caused by the exercise of some right or privilege created by the State' and (2) the offending party 'acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State.'" Id. (citation omitted). The Sixth Circuit has recognized "as many as four tests to aid courts in determining whether challenged conduct is "fairly attributable" to the State: (1) the public function test; (2) the state compulsion test; (3) the symbiotic relationship or nexus test; and (4) the entwinement test." Marie v. Am. Red Cross, 771 F.3d 344, 362 (6th Cir.

9

2014). A plaintiff need only show state action under one of the tests in order to proceed with his claim. Wilcher v. City of Akron, 498 F.3d 516, 519 (6th Cir. 2007).

Here, Amerigroup argues that, under any of the four state actor tests, the result is the same—it does not qualify as a state actor. (Doc. No. 44 at 22-27.) Sewell asserts that Amerigroup qualifies as a state actor under the nexus test based on its close relationship with Tennessee in administering the TennCare program. (Doc. No. 56 at 26-27.) Accordingly, the parties suggest that the Court must determine whether a MCO qualifies as a state actor under § 1983. However, the Court need not do so because whether Sewell has an enforceable right under § 1983 is dispositive.

As the basis for its § 1983 claim, Sewell relies on the antidiscrimination provision of the Medicaid Act, 42 U.S.C. § 1396u-2(b)(7), which provides that a Medicaid managed care organization, like Amerigroup, shall not discriminate with respect to participation or reimbursement of providers who act within the scope of the provider's license. (Doc. No. 56 at 28-29.) Amerigroup, in its motion, argues that the antidiscrimination prohibition set out in § 1396u-2(b)(7) is not an enforceable right, and, therefore, Sewell has failed to state a valid § 1983 claim. (Doc. No. 44 at 27-28.) The Court agrees.

A plaintiff asserting a claim under § 1983 must demonstrate that it has enforceable rights secured by a federal statute. See Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co., 214 F. Supp. 3d 606, 614 (E.D. Ky. 2016) ("Only violations of rights, not laws, give rise to § 1983 actions."); Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan, 817 F. Supp. 2d 515, 521 (E.D. Pa. 2011) ("Section 1983 provides a remedy for deprivation of rights secured by federal statute, not for violations of federal law."). Under the Medicaid Act's antidiscrimination provision, 42 U.S.C. § 1396u-2(b)(7), a Medicaid managed care organization is prohibited from discriminating "with respect to participation, reimbursement, or indemnification as to any provider

who is acting within the scope of the provider's license or certification under applicable State law, solely on the basis of such license or certification." 42 U.S.C. § 1396u-2(b)(7). The Medicaid implementing regulations require that "provider selection policies and procedures . . . must not discriminate against particular providers that serve high-risk populations or specialize in conditions that require costly treatment." 42 C.F.R. § 438.214(c).

"The question [of] whether a statute creates a cause of action, either expressly or by implication, is basically a matter of statutory construction . . . [and] what must ultimately be determined is whether Congress intended to create the private remedy asserted." Transamerica Mort. Advisors, Inc. v. Lewis, 444 U.S. 11, 16 (1979) (citing Touche Ross & Co. v. Redington, 442 U.S. 560, 568 (1979)). In the absence of express statutory authorization, Supreme Court precedent reflects continued reluctance to create private causes of action in the absence of clear direction from Congress. See Touche Ross & Co., 442 U.S. at 560 (noting the Court will create a private right of action only upon a showing of affirmative congressional intent to do so) (emphasis added).

The Supreme Court, in considering the Medicaid Act, has expressed significant doubt that providers, like Dr. Sewell, are intended beneficiaries or able to maintain a § 1983 cause of action under the statute. See Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1387-88 (2015). The Supreme Court, in considering the statute, opined:

> We doubt, to begin with, that providers are intended beneficiaries (as opposed to mere incidental beneficiaries) of the Medicaid agreement, which was concluded for the benefit of the infirm whom the providers were to serve, rather than for the benefit of the providers themselves. More fundamentally, however, the modern jurisprudence permitting intended beneficiaries to sue does not generally apply to contracts between a private party and the government, much less to contracts between two governments. Our precedents establish that a private right of action under federal law is not created by mere implication, but must be unambiguously conferred. Nothing in the Medicaid Act suggests that Congress meant to change that . . .

Id. (citations omitted). Further, in Armstrong, the Supreme Court reaffirmed its previous holding that for a statute to create private rights "its text must be phrased in terms of the persons benefited." See Gonzaga Univ. v. Doe, 536 U.S. 274, 283 (2002). Courts addressing the Medicaid Act have overwhelmingly held that its provisions do not afford a provider enforceable rights. See Med Diagnostic Labs., LLC v. Horizon Healthcare Servs., Inc., No. 2:18-616 (WJM), 2018 WL 1932707, at *2 (D.N.J. Apr. 24, 2018) (dismissing provider's § 1396u-2(b)(7) claim because the provision did not provide a right of action); see also Medevac MidAtlantic, LLC, 817 F. Supp. 2d at 521-27 (holding that emergency service provider did not state a § 1983 claim against managed care plan because provisions of the Medicaid Act which provider sought to enforce did not confer on providers individual enforceable rights); Appalachian Reg'l Healthcare, Inc., 214 F. Supp. 3d at 617 (same); Hawaii Coal. for Health v. Hawaii, Dep't of Human Servs., 576 F. Supp. 2d 1114, 1123 (D. Hawaii 2008) (dismissing plaintiff's claim premised on a violation of § 1396u-2(b)(5) with prejudice because the language of the statute did not indicate an intent to confer any specific, enforceable rights to individuals).

In considering § 1396u-2(b)(7), the Court, apprised of the relevant authority, concludes that the Medicaid antidiscrimination provision does not create a private federal cause of action enforceable through § 1983. The provision is phrased in terms of benefitting Medicaid insured, rather than providers. See Armstrong, 135 S. Ct. at 1387-88; Med Diagnostic Labs, LLC, 2018 WL 1932707 at *2. Further, the provision is aimed at giving MCOs, like Amerigroup, the parameters to manage their networks to meet the needs of their enrollees, as opposed to providing providers, like Sewell, a private right of action. See 42 U.S.C. § 1396u-2(b)(7). Thus, with regard to providers like Sewell, there is no express unambiguous indication that Congress created a right of action to enforce the provision. See Touche Ross & Co., 442 U.S. at 560.

Further, Sewell cannot rely on the Medicaid Act antidiscrimination provision's implementing regulation, as the federal regulation alone cannot create a private cause of action unless the enabling statute creates such right or else authorizes the appropriate regulatory agency to do so. See Alexander v. Sandoval, 532 U.S. 275, 291 (2001) ("Language in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not."). Accordingly, because there is no enforceable right, Sewell has failed to state a valid § 1983 claim.[2] The Court will dismiss Sewell's § 1983 claim.

## C. First Amendment Retaliation Claim

Amerigroup also argues that Sewell fails to state a First Amendment retaliation claim, under both the United States and Tennessee Constitutions, because: (1) it is not a state actor; (2) Sewell has not alleged that Amerigroup's purported retaliation impaired its ability to continue its free speech activity; and (3) the First Amendment allegations fail to demonstrate any causal connection between the alleged protected conduct and the retaliatory conduct. (Doc. No. 44 at 28-30.) Sewell responds that: (1) Amerigroup qualifies as a state actor; and (2) Amerigroup's conduct in threatening to "sanction" Dr. Sewell for filing complaints with the TDIC states a First Amendment retaliation claim sufficient to survive the motion to dismiss. (Doc. No. 56 at 29-31.)

A plaintiff may bring a First Amendment retaliation claim under 42 U.S.C. § 1983. See Valot v. Southeast Local Sch. Dist. Bd. of Educ., 107 F.3d 1220, 1226 (6th Cir. 1997). A plaintiff must first make a *prima facie* case of retaliation," which has three elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that

---

[2] Sewell cites to Judge Haynes' 2015 decision in Snodgrass-King Pediatric Dental Assocs., P.C. v. DentaQuest USA Ins. Co., Inc., 79 F. Supp. 3d 753, 767-68 (M.D. Tenn. 2015), for the proposition that § 1396u-2(b)(7) creates an enforceable right of action. However, that opinion predated the Supreme Court's opinion in Armstrong that clarified this issue. Accordingly, the Snodgrass decision is not outcome determinative.

would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." Dye v. Office of the Racing Comm'n, 702 F.3d 286, 294 (6th Cir. 2012); see also Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*).

The Court need not consider whether Amerigroup is a state actor for purposes of Sewell's First Amendment retaliation claim, as the Amended Complaint fails to set out what, if any, First Amendment impairment was suffered. Sewell alleges that the first letter to the TDIC caused Amerigroup to retaliate by sending the responsive letter threatening monetary sanctions and Amerigroup's responsive letter constituted First Amendment retaliation. (Doc. No. 42 at 28-29.) However, as noted in the Amended Complaint, Dr. Sewell subsequently sent a second complaint letter to the TDIC on August 23, 2017 regarding Amerigroup's conduct, its threatening "sanctions" letter, and other improper behavior. (Id. at 15.) Sewell's continued exercise of his First Amendment rights in the face of Amerigroup's allegedly adverse action belies any impairment of Sewell's First Amendment rights. Accordingly, without impairment, Sewell cannot maintain a First Amendment retaliation claim. See Marcilis-Bey v. Klujeak, 110 F.3d 64, 64 (6th Cir. 1997) (unpublished) (holding that plaintiff failed to state a claim of First Amendment retaliation because he had not shown any adverse consequences resulting from his First Amendment activity); see also Am. Civil Liberties Union of Maryland, Inc. v. Wicomico Cty., Md., 999 F.2d 780, 785 (4th Cir. 1993) ("A plaintiff alleging [retaliation] in violation of [his] constitutional rights must demonstrate, *inter alia*, that [he] suffered some adversity in response to [his] exercise of protected rights.") Put plainly, here, Sewell has not shown any impairment of his First Amendment rights nor any actual adversity because of the initial complaint to the TDIC (the identified First

14

Amendment activity). Although Sewell alleges that the letter from Amerigroup threatening sanctions constituted adverse consequences, there is no allegation that Amerigroup imposed the monetary sanctions. Therefore, because there has been no showing of any impairment or actual adversity in relation to Sewell's First Amendment rights, Sewell has failed to state a claim for First Amendment retaliation.

### D. Tortious Interference with a Business Relationship

Amerigroup asserts that Sewell's claim for tortious interference with a business relationship must be dismissed because (1) there are no allegations that Amerigroup acted with the intent to cause third parties to cease their business with Sewell; and (2) there are no allegations that Sewell actually lost business from any particular patient, vendor, or other business partner. (Doc. No. 44 at 21-22.) Sewell responds that the allegations in its Amended Complaint clearly show that Amerigroup engaged in wrongful conduct, including the denial of reimbursement for allergy care, with the intent of preventing it from offering allergy care, thereby destroying its business relationships with patients, other MCOs, and UAS. (Doc. No. 56 at 24-25.) Sewell alleges that Amerigroup's conduct was not accidental, but, rather, designed to inflict damage and disrupt various business relationships. (Id. at 25.) Moreover, Sewell contends that this conduct had a real, substantial economic effect, resulting in reduced services supplied to patients and damage to its business relationships with BlueCare and United. (Id.)

The tort of interference with business relationships in Tennessee requires that a plaintiff demonstrate:

> (1) an existing business relationship with specific third parties or a prospective relationship with an identifiable class of third persons; (2) the defendant's knowledge of that relationship and not a mere awareness of the plaintiff's business dealings with others in general; (3) the defendant's intent to cause the breach or termination of the business relationship; (4) the defendant's improper motive or improper means; and finally, (5) damages resulting from the tortuous interference.

15

Brown v. Nabors, No. 3:09-cv-0927, 2011 WL 2443882, at 17-18 (M.D. Tenn. June 15, 2011) (citing Trau–Med of Am., Inc. v. Allstate Ins. Co., 71 S.W.3d 691, 701 (Tenn. 2002)). With regard to the requisite improper motive, the Tennessee Supreme Court has elaborated:

> It is clear that a determination of whether a defendant acted "improperly" or possessed an "improper" motive is dependent on the particular facts and circumstances of a given case, and as a result, a precise, all-encompassing definition of the term "improper" is neither possible nor helpful. However, with regard to improper motive, we require that the plaintiff demonstrate that the defendant's predominant purpose was to injure the plaintiff.
>
> Moreover, in the attempt to provide further guidance, we cite the following methods as some examples of improper interference: those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules; violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship; and those methods that violate an established standard of a trade or profession, or otherwise involve unethical conduct, such as sharp dealing, overreaching, or unfair competition.

Trau–Med of Am., Inc, 71 S.W.3d at 701 n. 5.

In the instant case, Sewell has pleaded both improper motive and actual damages resulting from the tortuous interference. First, Sewell alleges that Amerigroup knew of its business relationships with its patients, other MCOs, and UAS. (Doc. No. 42 at 22.) Further, Sewell specifically alleges that Amerigroup interfered with those business relationships by orchestrating the false denial of reimbursement claims for allergy care (including on the basis of Sewell's contractual relationship with UAS) and urging United and BlueCare to adopt a similar position. (Id. at 9-14.) As a result of Amerigroup's alleged conduct, Sewell contends that it suffered substantial economic harm in the form of revenue reduction, a decreased patient pool, and a strained relationship with UAS. (Doc. No. 56 at 25.) Sewell also alleges that Amerigroup's predominant motive was to drive Sewell out of providing allergy care to patients in order to control

16

and limit its own expenses. (Doc. No. 42 at 17-18.) Viewing these factual allegations in a light most favorable to the plaintiff, the Court finds that Sewell has sufficiently stated a claim for tortious interference with a business relationship.

### E. Declaratory Judgment Claim

Finally, Amerigroup argues that, because all of Sewell's substantive claims fail, its Declaratory Judgement Act claim likewise fails as a matter of law. (Doc. No. 44 at 30.) Sewell argues that if at least one of its substantive claims survives Amerigroup's Rule 12(b)(6) motion, its Declaratory Judgment claim is viable. (Doc. No. 56 at 31.)

The Declaratory Judgement Act is "'an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant.'" Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995) (quoting Public Serv. Comm'n of Utah v. Wycoff Co., 344 U.S. 237, 241 (1952)). In deciding whether to entertain a declaratory judgment claim, the court should consider: (1) whether the judgment would settle the controversy; (2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue; (3) whether the declaratory remedy is being used merely for the purpose of procedural fencing or to provide an arena for a race for *res judicata*; (4) whether the use of a declaratory action would increase the friction between federal and state courts or improperly encroach on state jurisdiction; and (5) whether there is an alternative remedy that is better or more effective. Bituminous Casualty Corp. v. J & L Lumber Co., 373 F.3d 807, 813 (6th Cir. 2004).

As a preliminary matter, the Court notes that, contrary to Amerigroup's argument, substantive claims remain in this action, including Sewell's claims for breach of contract, tortious interference with a business relationship, and violation of Tennessee's Prompt Payment Act. Nonetheless, neither Amerigroup nor Sewell address the above-referenced factors. Turning to

these factors, the Court first finds that a declaratory judgment could settle the controversy as to the appropriateness of Amerigroup's reimbursement denials. Therefore, this first factor weighs in favor of exercising jurisdiction with regard to the declaratory judgment claim at issue because it would settle the primary controversy between the parties (i.e., the billing dispute between Sewell and Amerigroup). Accordingly, because the Court concludes that the judgment would settle the primary controversy between Amerigroup and Sewell, the judgment would also necessarily serve a useful purpose in clarifying the legal relations at issue. Scottsdale Ins. Co. v. Flowers, 513 F.3d 546 (6th Cir. 2008) ("[I]t is almost always the case that if a declaratory judgment will settle the controversy, then it will clarify the legal relations in issue."). Deciding this issue will allow the Court to better gauge the merits of Sewell's remaining state law claims, all of which are based on Amerigroup's allegedly unlawful actions in denying allergy-related reimbursements. Thus, the Court finds that this factor weighs in favor of not dismissing the Declaratory Judgment Act claim.

The Court finds Sewell has not asserted his Declaratory Judgment Act claim as an attempt at procedural fencing or to win a race for *res judiciata*. This third factor is meant to resist jurisdiction for "declaratory plaintiffs who file their suits mere days or weeks before the coercive suits filed by a 'natural plaintiff' and who seem to have done so for the purpose of acquiring a favorable forum." AmSouth Bank v. Dale, 386 F.3d 763, 788 (6th Cir. 2004). "The question is . . . whether the declaratory plaintiff has filed in an attempt to get her choice of forum by filing first." Id. at 789. Amerigroup, as opposed to Sewell, removed this action to the Court. (See Doc. No. 1.) Thus, the Court concludes that there is no record evidence demonstrating that Sewell's Declaratory Judgment Act is an attempt at procedural fencing or to win a race for *res judicata*, and the third factor weighs in Sewell's favor.

Fourth, the Court believes that, given that there are no current state proceedings, a declaratory judgment action here does not risk causing friction between federal and state courts, nor creating an improper encroachment into state jurisdiction. See Bituminous Casualty Corp., 373 F.3d at 813. Finally, the Court considers whether there is a better, more effective alternative remedy available. This "inquiry [ ] must be fact specific, involving consideration of the whole package of options available to the federal declaratory plaintiff." Scottsdale, 513 F.3d at 562. The Court finds this factor also weighs in favor of Sewell, as Amerigroup does not suggest any alternative remedy, and the Court does not find a ready alternative remedy.

In balancing the above-discussed factors, the Court finds that it is appropriate to exercise jurisdiction over Sewell's claim under the Declaratory Judgment Act.

## IV. Conclusion

For the foregoing reasons, Amerigroup's Motion to Dismiss (Doc. No. 55) is granted in part and denied in part.[3]

The Court will file an accompanying order.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE

---

[3] Although not addressed by Amerigroup or Sewell, the Court notes that Sewell's Amended Complaint contains a confusing subsection entitled "Application for Temporary and Permanent Injunctive Relief." (Doc. No. 42 at 29.) In that section, Sewell asks for a temporary restraining order, a preliminary injunction, and, upon conclusion of the instant action, a permanent injunction. (Id.) The Court interprets the request for a permanent injunction as a prayer for injunctive relief. However, as to the requests for a temporary restraining order or a preliminary injunction, Sewell has filed no motions or memoranda with the Court seeking such relief, as required by the Court's Local Rules. See LR 7.01(a), 65.01.