**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF TENNESSEE**
**NORTHEASTERN DIVISION**

| | | |
|---|---|---|
| **C.S. SEWELL, M.D. P.C. AND**<br>**CHRISTOPHER SEWELL, M.D.** | §<br>§<br>§ | |
| **Plaintiffs,** | §<br>§ | |
| **v.** | §<br>§ | **Case No. 2:17-cv-00062** |
| | §<br>§ | |
| **AMERIGROUP TENNESSEE, INC.**<br>**d/b/a AMERIGROUP COMMUNITY**<br>**CARE,** | §<br>§<br>§ | |
| | §<br>§ | |
| **Defendant.** | § | |

**~~FIRST~~SECOND AMENDED COMPLAINT**

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs C.S. Sewell, M.D. P.C. and Christopher Sewell, M.D. ("Dr. Sewell") file this ~~First~~Second Amended Complaint against Amerigroup Tennessee Inc. d/b/a Amerigroup Community Care ("Amerigroup") and would respectfully show the Court the following:

## I. NATURE OF THE CASE

Contrary to Amerigroup's statements to Dr. Sewell, TennCare, and even this Court, this case is not a simple business dispute that supposedly arose out of Amerigroup stumbling onto an alleged "subcontractor" performing services in a physician's office. Instead, this case concerns an effort by Amerigroup to run a rural family physician out of the practice of medicine along with more than a dozen physicians like him, after coming to an agreement to do so with the largest provider of allergy testing and immunotherapy services in Tennessee. The agreement was specifically formed between Amerigroup and

1

Allergy, Asthma & Sinus Center and PME Communications, LLC when Ned DeLozier, acting on behalf of those entities, convinced Amerigroup it would save money by not paying rural family physicians and pediatricians who were offering allergy testing and immunotherapy services within the scope of their licenses. The agreement included that Mr. DeLozier would provide information to Amerigroup, including its medical director and investigators about which physicians to target and why, and Amerigroup would follow through with threats of audits, prepayment reviews, recoupment, network termination, and legal action until the physicians stopped offering services Amerigroup did not want to pay for and that were in competition with Allergy, Asthma & Sinus Center and PME Communications' business.

At the forefront of the efforts were Amerigroup's quest to intimidate Dr. Sewell, as he was the first of many physicians Mr. DeLozier and Amerigroup targeted. The efforts included verbal harassment of Dr. Sewell, repeated audits, prepayment reviews, recoupments, threats of network termination, efforts to terminate his contract behind the back of the Tennessee Legislature when he complained, and ultimately a scored Earth campaign including efforts in this lawsuit to run him out of business. Those efforts did not stop at merely direct interaction with Dr. Sewell, but included contacting the other health insurance companies with whom Dr. Sewell was known to be in contract, including Amerigroup's competitors BlueCare and United Healthcare. The results of those efforts also led to additional agreements to put pressure on Dr. Sewell and other similar physicians, including by agreeing to jointly reduce the amount paid for allergy testing and immunotherapy by 60% and recent agreements among Amerigroup and its competitors in November 2018 to further limit the amount they would reimburse.

2

The result of the actions by Amerigroup and its conspirators has been a threatened and actual restriction on competition in the market for allergy testing and allergen immunotherapy to the ultimate detriment of consumers, including Amerigroup's health insurance members and other patients in markets where physicians such as Dr. Sewell are restricted from competing. As a direct consequence of Amerigroup's actions, most consumer are forced to either pay more for allergy testing or allergen immunotherapy by utilizing a specialist or consumers go without these services. Importantly, the Jamestown, Tennessee area when Dr. Sewell maintains his practice is fairly remote and the nearest available specialist is at least 50 miles away.

Dr. Sewell has now been forced to seek a declaratory judgment that he is entitled to provide allergy testing and allergen immunotherapy service within the scope of his license as a Tennessee physician and that Amerigroup's denials of Dr. Sewell's claims for reimbursement constitute improper discrimination. In addition, Dr. Sewell is seeking declaratory judgment that Dr. Sewell is not required under his provider agreement with Amerigroup to obtain approval of his agreement with UAS and Amerigroup does not have the authority to sanction Dr. Sewell by reason of communications with state agencies.

Dr. I.  Sewell also seeks damages for Amerigroup's breach of the provider agreement by its prepayment review and denials of claims. Further, Dr. Sewell seeks compensation for Amerigroup's violation of Tennessee's Prompt Payment Act's Bad Faith Refusal to Pay Insurance Claims Statute and seeks the additional remedies provided for bad faith denial. Additionally, Amerigroup's conduct constitutes tortious interference with the contracts and business relationship between Dr. Sewell and third parties, including Dr. Sewell's patients, UAS, and Amerigroup's competitors. Amerigroup's conduct will

constitute willful and intentional acts of interference and was done with malice and specific knowledge of the underlying contracts at issue and by improper means.

## II.  PARTIES

1.     C. S. Sewell, M.D. P.C. is a Tennessee professional corporation with its principal place of business located at 341 W. Central Ave., Jamestown, Tennessee, 38556-3410 and hereby appears through undersigned counsel.

2.     Christopher Sewell, M.D. is a family physician who provides, among other medical services, allergy care to his patients through his business practice, C. S. Sewell, M.D. P.C. located at 341 W. Central Ave., Jamestown, Tennessee, 38556-3410, and he also hereby appears through undersigned counsel.  For purposes of this complaint, both Dr. Sewell and his medical practice will be referred to collectively as "Dr. Sewell."

3.     Defendant Amerigroup is a Tennessee corporation with its principal place of business at 22 Century Blvd., Suite 220, Nashville, Tennessee 37214-3787 and has appeared in this cause through counsel of record. Amerigroup is a health insurance and managed healthcare contractor that is authorized to arrange for the provision and reimbursement of healthcare services to patients enrolled in Tennessee's Medicaid program, TennCare.

## III.  JURISDICTION AND VENUE

4.     This action is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the United States Constitution, the Tennessee Constitution, 42 U.S.C. § 1983, T.C.A. § 56-32-126(a), Section 1 of the Sherman Act, 15 U.S.C. §§ 1, and the Clayton Act, 15 U.S.C. §§ 15 and 26, the common law actions for breach of contract and tortious interference with business relations or advantage.

4

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over Dr. Sewell's state law claims pursuant to 28 U.S.C. § 1367.

6.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV.  FACTUAL BACKGROUND

**Dr. Sewell Provides Necessary and Critical Services to an Underserved Area.**

7.     This suit concerns the various efforts of Amerigroup to improve its financial position by limiting the source of necessary allergy care to TennCare members, including by refusing to reimburse primary care physicians such as Dr. Sewell who are acting within the scope of their license.

8.     Dr. Sewell is a board-certified family physician in Jamestown, Tennessee who provides healthcare to members of his community and the surrounding areas within the scope of his license by the State of Tennessee.  Dr. Sewell provides these services through his Tennessee professional corporation.

9.     The area that Dr. Sewell and his practice serves is rural and lacks immediate access for many healthcare services.  Jamestown is located in Fentress County in North Central Tennessee near the Kentucky border.  The closest city to Jamestown is Knoxville, which is approximately 90 miles or a nearly two hour car ride each way.   The next closest cities are Chattanooga and Nashville, which are 120 to 130 miles away.  As a result, Dr. Sewell is largely the only source for certain healthcare services to patients in the North Central Tennessee area, which is itself its own geographic market for these services.

10.    Some of the many patients for which Dr. Sewell cares are participants in the TennCare program, including TennCare members who have agreed to be covered by Amerigroup. As a family physician, Dr. Sewell provides all of his patients important preventive and primary care services, including the provision of allergy care consisting of allergy testing and, if warranted, allergen immunotherapy.

11.    When providing services to ~~Amerigoup~~Amerigroup members, Dr. Sewell bills Amerigroup for the medical services he provides pursuant to a December 12, 2006 Participating Provider Agreement ("Provider Agreement").

12.    The Provider Agreement defines the health care services that are deemed "covered services" pursuant to TennCare policies and the method that Dr. Sewell must follow in submitting claims to receive payment from Amerigroup for providing the covered services. Further, the Provider Agreement states that Amerigroup shall not exercise control or direction over the manner or method by which Dr. Sewell provides medical services to TennCare members.

13.    Pursuant to the Provider Agreement, when Dr. Sewell submits a claim for a "covered service" that is timely, complete, and in accordance with the terms of the Provider Agreement ("Clean Claims"), then Amerigroup is contractually obligated to pay Dr. Sewell as reimbursement for these Clean Claims. The services and claims submitted for reimbursement are governed by Current Procedural Terminology Codes ("CPT Codes") that are maintained by the American Medical Association ("AMA") and have been largely adopted by TennCare.

14.    As part of his practice, Dr. Sewell has provided certain Amerigroup members allergy skin testing. Allergy skin testing is a process whereby a physician determines

6

whether a patient may be allergic to certain known allergens that the patient may be exposed to in the environment. A skin prick test composed of small amounts of antigens is applied to the patient's skin, usually by a technician. After approximately 15 minutes, reactions on the skin are measured and recorded by the technician. Dr. Sewell then reads the results and interprets the test to determine, in his professional medical judgment, whether the patient has tested positive to a clinically relevant allergen. Dr. Sewell's professional determination as to whether the patient is allergic not only involves reviewing and interpreting the test, but also incorporates Dr. Sewell's prior physical examination of the patient and Dr. Sewell's review of the patient's clinical history. In performing this service, Dr. Sewell submits claims for reimbursement to Amerigroup under CPT Code 95004.

15.    When Dr. Sewell determines that an Amerigroup member has tested positive for clinically relevant allergies, Dr. Sewell considers whether to prescribe professional services related to allergen immunotherapy for that patient. In making a determination of whether to prescribe immunotherapy, Dr. Sewell assesses whether the patient would benefit from allergen immunotherapy, considers whether the benefit exceeds any inherent risk of treatment, and evaluates whether prior efforts at pharmacological management and/or avoidance have failed to adequately control the patient's symptoms. Dr. Sewell also consults with the patient regarding the potential benefits and risks associated with immunotherapy. If the patient elects to proceed with immunotherapy, Dr. Sewell will obtain the patient's written consent before prescribing the allergen immunotherapy preparation. In performing the professional service related to allergen immunotherapy, Dr. Sewell submits claims for reimbursement to Amerigroup under CPT Code 95165.

7

**Amerigroup Decided to Restrict Certain Services at the Urging of Allergists.**

16.     In 2016, Amerigroup began denying claims Dr. Sewell submitted for reimbursement under CPT Code 95004 & 95165 without adequate explanation.  Little did Dr. Sewell know, Amerigroup was communicating internally at Amerigroup Tennessee and with its affiliates—including Amerigroup Texas and Anthem, Inc.—and externally with ~~TennCare, other managed care organizations~~Allergy, Asthma & Sinus Center, PME Communications, and ~~commercial carriers~~Ned DeLozier regarding Amerigroup halting reimbursement for primary care providers for such services, including Dr. Sewell or any such physician in contract with United Allergy Services ("UAS").  United Allergy Services is an entity that trains and provides auxiliary personnel who assist physicians by performing incident-to services under the physician's supervision, such as application of a skin prick test to the skin, paperwork and documentation, and the physical combination and dilutions of antigens in serial dilution vials necessary for immunotherapy.  Such technician services ~~provided by such~~and auxiliary personnel provided by UAS are a necessary aspect of the allergy testing and immunotherapy product and are the same as provided in a board-certified allergists' office.   Yet board-certified allergist have attempted to convince Amerigroup to limit its exposure to allergy claims by primary care physicians where Amerigroup could by refusing to reimburse for the physicians' on any pretext it could develop.

17.     As early as 2015, Amerigroup Tennessee medical director, Mark Mahler, M.D. met with board-certified allergists and other individuals representing these allergists to agree to work together to drive primary care physicians out of the allergy services market. In September 2015, Dr. Mahler met with one such individual, Ned Delozier which he

8

documented in emails as "from Allergy Asthma Sinus Center, a large and well-respected group allergists in TN." Ned DeLozier is in fact the business development director and executive for PME Communications. PME Communications is the management company for a clinic of board-certified allergists named the Allergy, Asthma & Sinus Center. The Allergy, Asthma & Sinus Center is the largest provider of allergy testing and immunotherapy services in the State of Tennessee, as its nearly 30 Tennessee locations include six offices in the Knoxville area, and the following other geographical markets: Athens, Clarksville, Columbia, Cookeville, Crossville, Franklin, Greeneville, Harriman, Hendersonville, Hermitage, Johnson City, Lawrenceburg, Lenoir City, Madisonville, Maryville, McMinnville, Morristown, Mt. Juliet, Oak Ridge, Sevierville, Spring Hill, West Nashville, and White House. Indeed, in almost every geographical market in Tennessee, Allergy, Asthma & Sinus Center controls more than 70% of the allergy testing and immunotherapy services performed in those local areas.

18.    Since family physicians and pediatricians began offering allergy testing and immunotherapy services in conjunction with UAS, the Allergy, Asthma & Sinus Center has been losing patients and revenue to those physicians. In other words, physicians such as Dr. Sewell who once were sources of referrals for these locations became competitors in the market. Consequently, the Allergy, Asthma & Sinus Center and PME Communications, including Ned DeLozier, had a great interest in driving these physicians out of this market. Various efforts to do so over the years have failed, but more recently Ned DeLozier in particularly learned that forming an agreement with a payor for the services would accomplish the intended result.

9

19.    It was for this reason that Ned Delozier started discussing his company's competitors with Amerigroup's Dr. Mahler in late 2015—to solicit an agreement on a plan to deny allergy related claims submitted by primary care physicians such as Dr. Sewell or to scare them out of the market. After meeting in person with Mr. Delozier, Dr. Mahler and Amerigroup did just that and agreed to work with these allergists to further their common purpose of eliminating primary care physicians from the allergy services market.  The plan was for Ned Delozier and the allergists to provide Amerigroup with information that Amerigroup could rely on to justify denying valid claims from physicians, like Dr. Sewell, who contracted with UAS. The initial idea discussed at Mr. Delozier and Dr. Mahler's first meeting was labeling such practices as "medically unnecessary," even though there was no evidentiary support for this determination.

20.    Ned Delozier followed up this initial meeting by emailing Dr. Mahler on January 22, 2016 and confirmed that he would follow through with his part of the plan and provide Dr. Mahler with "examples of medically unnecessary allergy diagnostics and treatment being performed by primary care providers" in Tennessee. On January 29, 2016, Mr. Delozier visited Dr. Mahler in Nashville and delivered these "examples" to Amerigroup.  Throughout the Spring of 2016, Dr. Mahler and Mr. Delozier continued their discussions, including multiple in-person and phone meetings working together to determine which primary care physicians to target. During this time, Dr. Sewell in particular hit Mr. DeLozier's radar because he was a prior referral source for the Allergy, Asthma & Sinus Center's Cookeville, Crossville, and Knoxville locations and had rebuffed attempts to go into business with them instead of UAS.

10

17.21.  Meanwhile, following their initial meetings and after receiving the information from Mr. Delozier on primary care providers practicing allergy care, Amerigroup began sharing their plan to restrict competition in the allergy services market with Amerigroup affiliated companies. In May 2016, Amerigroup communicated with the National Medical Director for Reimbursement Policy Management for Anthem, Inc., Priscilla Alfaro about developing such a pretext.  Dr. Alfaro, acting on behalf of Amerigroup Texas, had previously communicated with other competitor managed care organizations in Texas regarding primary care physicians in contract with UAS, and attended a meeting to discuss how to limit reimbursement for such providers in July 2013.  Because the discussion at the "Face to Face" meeting crossed the line into reimbursement policy, it exceeded what is permissible in this forum and was thus unusual for competitor managed care organizations.

18.22.  Dr. Alfaro communicated with investigators and other leaders at Amerigroup regarding its investigation and reimbursement of primary care providers like Dr. Sewell in contract with UAS.  Dr. Alfaro brought her previous communications with other managed care organizations in Texas to shape how Amerigroup would handle Dr. Sewell's claims. Senior Fraud Investigator John Taylor communicated with Courtney Pearre, Vice President of Government Relations, that Taylor had spoken to Dr. Alfaro regarding primary care physicians practicing allergy testing and allergen immunotherapy and that she was "extremely knowledgeable regarding immunotherapy."

**Amerigroup Implements a Plan to Coerce Dr. Sewell out of the Market.**

19.23.  In June 2016, Amerigroup officially opened an "investigation" of Dr. Sewell.Sewell after Dr. Mahler and Ned DeLozier's many meetings about excluding primary care physicians from the market and after Mr. Taylor's conversation with Dr.

11

Alfaro about any basis to restrict coverage to specialists. The next month, Amerigroup opened investigations into other primary care providers who were providing allergy testing and immunotherapy to their patients. Any by August 2016, while Amerigroup was denying claims that Dr. Sewell submitted for allergy testing and allergen immunotherapy, Amerigroup was busy communicating about how to halt reimbursement completely for Dr. Sewell and shutting down any primary care providers in the market. For example, Mr. Taylor told the Manager of the Special Investigations Unit at Amerigroup that ~~the Amerigroup Tennessee medical director, Mark Mahler, M.D.,~~Dr. Mahler, "wanted to be a part of any future meetings/discussions regarding UA [United Allergy] and 95165." United Allergy Services does not bill the claims at issue; rather, Dr. Sewell bills for these claims for the professional services performed by Dr. Sewell. Amerigroup decided that because Dr. Sewell was in contract with UAS, which facilitated a technical and economic component of Dr. Sewell's competition in the market, Amerigroup would find ways to break that relationship and run Dr. Sewell and similar physicians out of the market. Amerigroup thus determined it would stop reimbursement for all allergy claims on any basis it could find—and communicated with others to encourage them to stop reimbursement too.

~~20.~~24.  On August 10, 2016, Mr. Taylor spoke to an investigator at Amerigroup Texas, Dana Barfield, regarding her investigations into primary care providers and UAS. Ms. Barfield soon after provided Mr. Taylor with OIG Advisory Opinion No. 11-17, an opinion obtained by a sham entity named Universal Allergy Labs, LLC. The opinion called into question whether the shell of an entity ran a risk of inappropriate use of allergy services, but the entity's name was redacted from the opinion by statute. Despite the opinion only

12

applying to the requesting entity, which has never done business, board-certified allergists and entities such as Amerigroup have falsely attributed the opinion to the practices of physicians such as Dr. Sewell and physicians that do business with UAS.

21.25.  Mr. Taylor did just that, first by contacting Dr. Sewell in or around August 2016 following his communications internally at Amerigroup and with others at Amerigroup affiliates and with external third parties, including Anthem, Inc., Amerigroup Texas, other Tennessee managed care organizations, and commercial carriers.  Mr. Taylor stated that he had to preapprove all claims under CPT 95004 and 95165 because Dr. Sewell was not a board- -certified allergist and because he was in contract with UAS, and suggesting Dr. Sewell was committing fraud by being in violation of the sham opinion.  Mr. Taylor also shared a copy of the same OIG Advisory Opinion 11-17 with Dr. Sewell that was shared with Mr. Taylor by Ms. Barfield and suggested that Dr. Sewell's arrangement for antigen supplies and a technician from UAS violated the sham opinion.contract.

**Amerigroup Seeks to Involve its Competitors in its Boycott**

22.26.  By September 2016, Amerigroup decided to attempt to convincehad already engaged in discussions with its two managed care competitors, United Healthcare and BlueCare (a division of Blue Cross Blue Shield of Tennessee) to adoptabout adopting the same position that Amerigroup had developed with the allergists regarding eliminating reimbursement for allergy testing or immunotherapy at the primary care level.  For example, that month Mr. Taylor participated and in a Healthcare Fraud Working Group meeting regarding particular, limiting reimbursement to Dr. Sewell with those two competitors.  .

13

23.    Also in September 2016, Mr. Taylor met again with BlueCare at that entity's office in Chattanooga to attempt to persuade that entity to adopt a similar position on allergy testing and immunotherapy claims submitted by Dr. Sewell and other primary care physicians.

27.    Also in September 2016, Mr. Taylor participated in a monthly coordination call with United Healthcare and BlueCare in Tennessee and discussed Dr. Sewell and primary care Amerigroup investigators, including Mr. Taylor, participate in a monthly coordination calls with their two largest competitors in Tennessee, United Healthcare and BlueCare. During these calls, investigators from each of these competitor MCOs share pricing policy information and disclose comprehensive details about investigations that the respective MCOs are conducting aimed at cutting off reimbursement to providers, including disclosing the specific names of the providers being investigated. The investigators then encourage their competitors to conduct their own investigations and to limit or shut off reimbursement to these providers.  In both September and October 2016, Mr. Taylor discussed Dr. Sewell and shared details of Amerigroup's investigation of Dr. Sewell and subsequent reimbursement decisions with United Healthcare and BlueCare.

28.    Following the September 2016 call where Dr. Sewell and other primary care providers in contract with UAS. The next day were discussed, Amerigroup conducted aits own internal coordination conference call with Amerigroup representatives from the Special Investigations Unit and Compliance, including with investigators from Amerigroup Texas.  They discussed allergy testing and allergen immunotherapy and what they called "third party contractors," or companies like UAS.

14

29.     In addition to these monthly coordination calls, Amerigroup and its competitors also hold healthcare fraud working group meetings several times a year that served the similar purpose of sharing information about certain providers with their competitors. And again in September 2016, Mr. Taylor met with BlueCare and United Healthcare at BlueCare's office in Chattanooga for one of these working group meetings and attempted to persuade these competitors to adopt a similar position on allergy testing and immunotherapy claims submitted by Dr. Sewell and other primary care physicians.

~~24.~~30. While Mr. Taylor was meeting with Amerigroup's competitors in the Fall of 2016, Dr. Mahler was also continuing to coordinate on Amerigroup's behalf through several additional meetings and phone conferences with Mr. Delozier from the Allergy, Asthma & Sinus Center to further discuss how to effectuate their agreement on restricting payment of allergy claims to board-certified allergists.

**Amerigroup Misleads TennCare to Facilitate the Attempted Boycott**

~~25.~~31.  On September 27, 2016, Amerigroup met with the Office of Program Integrity of TennCare for its Quarterly Meeting. During this meeting, Amerigroup and TennCare discussed Dr. Sewell and Amerigroup's investigations of other primary care providers in contract with UAS. Amerigroup claimed that a "UAS allergy tech from another office under investigation had tipped off the UAS allergy tech at Camden Medical," another provider in contract with UAS. Following that development, Amerigroup placed Camden on pre-payment review.

~~26.~~32. Amerigroup and TennCare also discussed that they had communicated with primary care providers in contract with UAS, and at least one provider had decided to stop working with UAS and was no longer billing for allergy testing and allergen

immunotherapy—following Amerigroup's interview and interrogation of that provider for its investigation. Mr. Taylor and other investigators were at the time interviewing and interrogating any known providers in contract with UAS.

27.33. In October 2016, Amerigroup internal communications demonstrate that Amerigroup understood that primary care providers like Dr. Sewell were providing this service to patients in rural Tennessee, patients who would otherwise not be able to receive this care without having to travel long distances to see a specialist. Amerigroup continued to try to find ways to stop reimbursement of these providers, including Dr. Sewell, and again relied on the OIG opinion for its basis. Sewell, and again relied on "inappropriate" or fraudulent billing suggestions that originated from Mr. DeLozier. Under Mr. DeLozier's and Dr. Mahler's theory, physicians in contract with UAS were engaged in fraudulent billing because an allergist was not performing the "supervision" that Mr. DeLozier claimed was necessary to provide the services. This theory direct contradicts CMS regulatory guidance, but that did not stop Amerigroup from suggesting it to Dr. Sewell and to TennCare. The position that Amerigroup chose to take was that the services at issue were being provided by a technician, not the physician, contrary to the law. Based on that faulty premise, Amerigroup asserted the technician was not credentialed in violation of TennCare requirements. Amerigroup then chose to institute a "prepayment review" on Dr. Sewell's claims with the foregone conclusion that it would deny the claims even after he submitted the medical records.

**Amerigroup Manipulates the Claims Appeals Process in Bad Faith**

28.34. The reason Amerigroup acted in this way was not some concern over a hyper-technical reading of its contract or TennCare requirements, nor was it a concern over the

16

standard of care of the quality of Dr. Sewell's services.  It was about Amerigroup making the money it would pocket if it paid out less in claims than it took in from TennCare because Amerigroup is paid on a per capita basis—meaning the more Amerigroup reimburses the less it makes.  When Amerigroup investigators communicated with each other on how to deny claims for Dr. Sewell and other primary care providers in contract with UAS, one investigator stated that they needed a medical director to suggest issues with the medicine.  And when that medical director "did not want to do it" the problem was they "didn't know if they would appoint a different Medical Director to do it or not."

29.35. So Amerigroup stuck with the original plan of asserting the billing was fraudulent and denying claims on a "Subcontracted provider" basis. Dr. Sewell appealed each of the denied claims through the normal appeal process, but Amerigroup never responded to the appeals as statutorily required.  On December 16, 2016, Dr. Sewell, through counsel, sent Amerigroup a letter explaining in detail why Dr. Sewell's claims submitted under CPT codes 95004 and 95165 were Clean Claims and required payment under the Provider Agreement and why Amerigroup's statements about him were false.

36.      After the letter to Amerigroup made its way to Amerigroup legal, their thought process changed.  The letter pointed out that Dr. Sewell was the provider of the services actually being billed, that CMS and Tennessee law, including TennCare requirements, did not require credentialing or disclosure of the technician, who was acting incident-to, and that Amerigroup needed to pay the claims at issue.  The subsequent discussions within Amerigroup in late December and early January determined that a different basis was necessary to deny claims.  Those discussions resulted in more meeting with Amerigroup and Mr. DeLozier.

17

37.     On January 3, 2017, Mr. DeLozier met with Dr. Mahler in Amerigroup's corporate office to see if he could offer a medical basis for Amerigroup to continue to deny claims.  During that meeting Mr. DeLozier went over "medical records" belonging to primary care physicians he claimed were practicing allergy testing and immunotherapy. Mr. DeLozier told Dr. Mahler that he could rely on the records and the representations of allergists from the Allergy, Asthma & Sinus Center to assert that primary care physicians who were in contract with companies such as UAS were supplying medically unnecessary care.  Dr. Mahler agreed to do so, even though Mr. DeLozier was not a physician, had no way to verify the documents he was given, or that they even applied to Dr. Sewell and others.  Dr. Mahler instead took notes from Mr. DeLozier on what the documents supposedly meant.  The documents themselves contained pricing information of Amerigroup's competitors for these services, including of BlueCare and United Healthcare.

38.     On January 6, 2017, Dr. Mahler held a conference call with Mr. Taylor and Dr. Alfaro regarding Amerigroup's investigation of Dr. Sewell and his appeal of the faulty assertion that the technician was the provider of the services in question.  At this same meeting, Dr. Mahler invited Mr. DeLozier to share these ideas on driving primary care physicians out of allergy testing and immunotherapy services at an upcoming joint meeting with Amerigroup's largest competitors in Tennessee, United Healthcare and BlueCare Following that call, Amerigroup set out to explore alternative bases to deny Dr. Sewell's claims.

39.     On January 17, 2017, Dr. Mahler sent the notes and materials from his meeting with Mr. DeLozier to Mr. Taylor via email to further his investigation and basis for denial

of claims of Dr. Sewell and other similar physicians. Dr. Mahler also stated in the same email, in which Mr. DeLozier was copied, "Please connect with Mr Delozier. Let me know who I can support elimination of inappropriate allergy services in our network." Based on the context of their correspondences the phrase "inappropriate allergy services in our network" clearly referred to primary care physicians, like Dr. Sewell, contracting with UAS. As further proof of this, Mr. Taylor sent the information to Rhonda Garrard, a senior provider auditor in Amerigroup's Special Investigations Unit, who determined that the documentation provider by Mr. Delozier was "the same documentation as the other [UAS] providers" and thus Ms. Garrard "would venture to say [those providers] were using [UAS] as well."

30.40. On February 1, 2017, Amerigroup responded to Dr. Sewell's December 16, 2016 letter. Rather than addressing the merits of Dr. Sewell's letter, Amerigroup offered only a post-hoc justification for its denials which incorrectly relied on Section 3.9 of the Provider Agreement that requires that Dr. Sewell obtain written approval if he subcontracts with another physician or healthcare provider to perform the provider services for which Dr. Sewell bills Amerigroup.

31.41. On February 10, 2017, Amerigroup held another conference call with Mr. Taylor, Dr. Mahler, Dr. Alfaro, and others regarding Dr. Sewell and Amerigroup's investigations of primary care providers in contract with UAS, including Dr. Sewell, to continue to plot howdetermine if they could assert any basis to eliminate primary care physiciansdeny the claims including the materials previously provided by Mr. DeLozier. The reason to do so, which is evident from the allergy care marketnumerous emails on the

19

subject, was Amerigroup stood to recover more than $1,000,000 per year in taking such a position, a figure it later increased to $6,000,000.

42.     On February 14, 2017, Mr. Taylor and another Amerigroup investigator, Shelly Williamson held a conference call with Mr. DeLozier in which emails suggest were about these "allergy cases" and the materials Mr. DeLozier provided.  Although Mr. Taylor and Mr. Williamson regularly took notes of such calls, Amerigroup has yet to produce those notes despite repeated requests to do so.  Following the call, Mr. Taylor determined to assert in multiple instances that Dr. Sewell and other similar physicians could not provide allergy testing or immunotherapy services because it was "outside the scope of their practice" and was fraudulent.

32.43.  The next week on February 16, 2017, Annette Dreifke, an investigator at TennCare, and Mr. Taylor communicated regarding primary care providers in contract with UAS and stated that she wanted to move one provider "quickly to law enforcement." Mr. Taylor responded that Amerigroup had paid over a million dollars for approximately 115 providers who Mr. Taylor falsely stated were "practicing outside the scope of their license." Mr. Taylor stated that he filtered out board-certified allergists and ENTs.  At this time, Amerigroup was also still communicating with board certified allergistsNed DeLozier about ahow to defend the false "standard of care" that primary care providers should not practice allergy testing and allergen immunotherapy, as those services should be reserved to specialists like allergists.

33.44.  On March 1, 2017, Dr. Sewell responded through counsel to Amerigroup's February 1 letter explaining why the provision Amerigroup cites does not apply to the claims in question—namely, as explained above, Dr. Sewell only bills for the professional

20

services he alone provides and thus does not contract out any of the professional services for which he bills Amerigroup.

**Amerigroup Retaliates Against Dr. Sewell By Seeking To Terminate**

~~34.~~45.  ~~The next day, on~~On March 2, 2017, Mr. Taylor emailed the Office of Program Integrity Compliance Manager, Jarrod Webb that Amerigroup had decided to terminate Dr. Sewell's contract without cause.  TennCare responded that before doing so, they would like to meet with Amerigroup as they "anticipate[d] this meeting to be very beneficial for all involved parties."

~~35.~~46.  On March 8, 2017, the Tennessee Provider Network Workgroup met to discuss primary care providers providing allergy care while in contract with UAS.  Kimberly Weakley and Carvin Vaughn of Amerigroup gave the presentation and discussed the State concern about terminating without cause.  Further, Amerigroup acknowledged the impact of allergy termination on the primary care network in Gibson and Benton counties, in West Tennessee. At the meeting, Amerigroup falsely stated that primary care providers practicing these services are at risk for a "quality standpoint" as these services are not being performed by an allergist.  TennCare informed Amerigroup that it was concerned in network deficiencies—as Amerigroup as a managed care organization must have a sufficient network of providers for its members.  For example, Amerigroup itself has recognized that the nearest allergist to Dr. Sewell is 90-100 miles away.

47.     On March 10, 2017, Amerigroup met internally about how to terminate the numerous primary care physician providers such as Dr. Sewell from the network to ensure they would not offer allergy testing and immunotherapy services.  Internal network reviews

of the effects of those terminations showed they could not do so and uphold their network adequacy requirements if scrutinized.

36.48.  At the April 13, 2017 Tennessee Provider Network Workgroup, Amerigroup made the "decision not to make determination until after legislative decision closed" because it did not want governmental scrutiny of its secret decision to terminate Dr. Sewell. Amerigroup recognized that Dr. Sewell performing allergy testing and allergen immunotherapy "could head off ER visits," but Dr. Mahler continued to falsely state, relying on allergists, that such treatment is "inappropriate" for a family physician.  This was based on the "[a]dditional allergists" who "joined Dr. Mahler fielded specific documents, escalated it and got involved with contracting."  After speaking with board-certified allergists about how to stop reimbursement for primary care providers in contract with UAS, Amerigroup was now "[t]rying to get strategy together through transformation."

49.  On April 20 and 21, 2017, Ned DeLozier again communicated with Amerigroup, this time with Senior Associate General Counsel Laura Schmidt, to discuss Amerigroup's reimbursement policy, and the following month Mr. DeLozier provided Amerigroup with additional examples of primary care physicians practicing allergy services. Amerigroup was still trying to find a basis to justify its conduct even after TennCare refused its position.  Meanwhile Mr. DeLozier was offering to meet jointly with the other MCOs to convince them to adopt Amerigroup's position of restricting allergy testing and immunotherapy services to specialists.

37.50.  On May 26, 2017, Amerigroup's investigator, John Taylor, finally responded to Dr. Sewell's December 19, 2016 correspondence by claiming that as part of his "prepayment review," Mr. Taylor again determined that the claims should be denied.  The

new basis for denial was that the services allegedly were performed under an undisclosed subcontract with UAS without prior approval from Amerigroup and TennCare. *Id.*

38.51.  At the next Tennessee Provider Network Workgroup, Amerigroup falsely stated again that UAS technicians were performing all of the services and not Dr. Sewell—in contradiction to the many statements made by Dr. Sewell and other primary care providers who had been interviewed and interrogated by Mr. Taylor and other investigators. Amerigroup relied on and colluded to share information with others, including Amerigroup Texas investigators, Dr. Alfaro (who had communicated about this issue with other Texas managed care organizations), other managed care organizations in Tennessee, and board-certified allergistsMr. DeLozier about how to restrict reimbursement and even terminate Dr. Sewell's contract with Amerigroup.

39.52.  Ultimately, Amerigroup learned that TennCare decided to take no further action despite Amerigroup's many pleas, yet Amerigroup continued to communicate about these providers and how to halt reimbursement anyway.  On June 19, 2017, TennCare communicated with Amerigroup that "[t]he state will be taking no further action into this matter at this time."  Nevertheless, Amerigroup continued to falsely claim to Dr. Sewell and others that TennCare required Amerigroup to deny claims to Dr. Sewell and authorized Amerigroup to sanction Dr. Sewell.

40.53.  On June 26, 2017, Dr. Sewell responded to Mr. Taylor's letter and once again explained in detail that Amerigroup's denials were incorrect because they presuppose that Dr. Sewell has subcontracted his duties, which is not the case.  Dr. Sewell also once again explained that Amerigroup has still done nothing to address Dr. Sewell's detailed analysis of the contract and the claims in issue.

**Amerigroup Further Retaliates for a Complaint Dr. Sewell Made**

~~41.~~54.  Meanwhile on June 20, 2017, Dr. Sewell, along with another Tennessee primary care provider, made a complaint to the Tennessee Department of Commerce and Insurance concerning Amerigroup's conduct.  The department then required Amerigroup to respond by August 6, 2017.  Amerigroup requested two extensions to extend its deadline to respond until August 14.

~~42.~~55.  During the period of extension, on August 7, 2017, Amerigroup sent Dr. Sewell another letter threatening Dr. Sewell for making complaints to the Tennessee Department of Commerce and Insurance.  In addition to continuing to allege that Dr. Sewell breached Section 3.9 of the Provider Agreement, the letter also made numerous false statements of fact, including that Dr. Sewell is not solely responsible for the medical advice and services that he provides to his allergy patients; that Dr. Sewell failed to provide Amerigroup with a written copy of Dr. Sewell's contract with UAS as required by the Provider Agreement; and that Dr. Sewell failed to obtain Amerigroup's written approval for the alleged "subcontract" with UAS. Amerigroup then stated it would assess as a "sanction" the denial of all claims for allergy diagnosis, testing, treatment, preparation, and supervision services that Dr. Sewell has submitted in which UAS was involved, which it assessed to the tune of more than $20,000.00.  The letter threatened to assess "additional sanctions," including automatically recouping all previously paid claims related to services in which UAS was involved and terminating Dr. Sewell from the Amerigroup network if Dr. Sewell continued to complain to authorities.

~~43.~~56.  Dr. Sewell further complained to the Tennessee Department of Commerce and Insurance on August 23, 2017 about Amerigroup's retaliation and threats for his complaint

24

to that body. Amerigroup routinely pays board-certified allergists, even when they too rely on auxiliary personnel to provide technician services (as all physicians do) and the other MCOs pay for primary care physicians using auxiliary personnel despite Amerigroup's false claim that TennCare does not permit them to do so. As explained in Dr. Sewell's complaint to the State, allergy testing services billed under CPT Code 95004 concern the test interpretation and report performed by the physician. Similarly, allergen immunotherapy services billed under CPT Code 95165 concern the physician's professional services for the supervision of the preparation and provision of antigens for allergen immunotherapy. Dr. Sewell was the only physician provider for these services billed to Amerigroup. Dr. Sewell's use of auxiliary personnel, equipment, and FDA approved antigens was not billed to Amerigroup and Dr. Sewell did not subcontract his professional services to anyone. Just as a board-certified allergist is the provider, so too is Dr. Sewell. Amerigroup's repeated threats to retaliate against Dr. Sewell for making all of this known to TennCare were wrong.

44.57.  A few days later on August 29, 2017, Mr. Taylor communicated with the then President of Amerigroup Tennessee, Al King. Mr. Taylor sent Mr. King a list of known providers working with UAS, and stated that some were not on pre-payment review because they had agree to terminate their relationship with UAS and stop providing allergy care. In other words, Amerigroup was successful at punishing providers for continuing to offer allergy testing and immunotherapy—services that family physicians, pediatricians, and other primary care physicians may perform within their licenses.

45.58.  Meanwhile, on September 14, 2017, TennCare responded to Dr. Sewell's complaints and directed that Dr. Sewell may pursue his own legal and contractual remedies

Case 2:17-cv-00062   Document 69-2   Filed 12/22/18   Page 25 of 45 PageID #: 1793

outside of the administrative process. Amerigroup claimed to the Tennessee Department of Commerce and Insurance (now the Bureau of TennCare) that Amerigroup did not intend to seek recoupment or kick physicians out of the network. Nevertheless, Amerigroup in fact has sought recoupment against Dr. Sewell in retaliation for the complaints, which it terms "overpayment," and has repeatedly threatened to kick him out of the network if he continues to complain to the authorities.

46.59. On September 21, 2017, as Amerigroup had been doing regarding reimbursement on its monthly conference calls, Ms. Hitt informed others at Amerigroup that Ashley Reed of TennCare "expressed the desire to avoid a legislative hearing if possible," and that Amerigroup would reach out to Amerigroup's competitors for an update regarding this issue with reimbursement of primary care providers in contract with UAS, including Dr. Sewell. Ms. Hitt stated, "This is a much better update than expected" and Amerigroup has continued to push its competitors to adopt the same reimbursement policies to foreclose competition in the relevant market.

**Amerigroup's Conduct Damages Dr. Sewell, His Practice, and Consumers**

47.60. The effect of Amerigoup's conduct has taken its toll on Dr. Sewell and his practice. As a result of a smear campaign against Dr. Sewell and efforts to retaliate against him, Dr. Sewell cannot treat Amerigroup patients for fear of retaliation and because Amerigroup appears primed to accept services but not pay for them, pocketing the money. As a result, Dr. Sewell's patient population, including of Amerigroup patients, has dwindled and Dr. Sewell has not been reimbursed for services for which he spent significant resources himself. Moreover, other health insurance companies that Amerigroup has communicated with have reduced reimbursement for Dr. Sewell for his

26

allergy immunotherapy claims by 60%, citing a difference in how they will reimburse, causing him lost profits as a result. Plaintiffs are currently estimated to have suffered more than $5001,000,000 in damages which are growing by the day and are estimated to grow exponentially as Amerigroup's conduct continues.

48.61. In addition to Dr. Sewell's practice, consumers have also been harmed. Dr. Sewell is the only available alternative for certain healthcare necessary services in North Central Tennessee, including allergy testing and immunotherapy. Patients who cannot access these services through Dr. Sewell often have no alternative because any other provider of the services is too far away, and the patients are high risk given their need for such services, including asthmatics and severe allergy sufferers. As TennCare and CMS regulations observe, travel more than 25 miles for such primary services is considered outside the bounds of the appropriate area. In any event, in no way is travel long distances such as 50 miles to other cities considered reasonable access to care or the reasonable distance in which a consumer can be expected to access these services.

49.62. For example, Amerigroup's decision to pay only board-certified allergists renders allergy testing and immunotherapy infeasible to most patients in the relevant geographic market, as the closest full time allergists are 90-100 miles away. and the temporary clinics are still at least 50 miles. Most consumers will not travel 180100-200 miles round trip for these services, especially considering that allergen immunotherapy is an ongoing treatment administered over the course of 3-5 years.

50.63. The consumers who are able to travel for services face a significant burden in additional costs than they would pay otherwise, including in additional travel distance, wait time for an appointment, wait time in the office, and time off work and school.

27

51.64. While Amerigroup has not terminated Dr. Sewell from its network, it has effectively done so and thus left a void in the North Central Tennessee area in terms of its network adequacy under the TennCare program. As a resultMoreover, Amerigroup has expanded its efforts to restrict allergy testing and immunotherapy by targeting at least 10 other family physicians and pediatricians, mostly in rural areas, after the deadline for those physicians to intervene in this case. For example, beginning July 31, 2018, Amerigroup sent letters to those physicians threatening to terminate them from the network and recoup previously paid claims if they did not stop practicing allergy testing and immunotherapy. As a result, those physicians stopped performing those services out of fear and without admitting its actions publicly or to TennCare, Amerigroup is in violation of its requirements for coverage under that program.

52.65. Amerigroup's efforts to involve its competitors has also threatened Dr. Sewell's practice, as he relies on their reimbursement as well. Without health insurance reimbursement, even at just the TennCare level, Dr. Sewell could not maintain a viable medical practice and consumers would have no options for all services in the area. Recent efforts to convince those health insurance companies to adopt the same reimbursement policies, as Amerigroup was able to accomplish in November 2018 by convincing BlueCare and United Healthcare to agree to Amerigroup's amount of reimbursement of immunotherapy claims and its suggestion on preauthorization of immunotherapy claims, only furthers the threat of reimbursement from these recent agreements.

**CLAIM ONE - DECLARATORY JUDGMENT**

53.66. Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

28

54.67.  Under federal and Tennessee law, primary care physicians may provide allergy testing and immunotherapy treatment if performed within the standard of care. In fact, the question of whether family physicians may practice allergy testing and immunotherapy was resolved by the Department of Health and Human Services nearly 30 years ago in 1989.

55.68.  Federal law and regulations prohibit Amerigroup from adopting a policy that improperly discriminates against the participation and reimbursement of providers acting within the scope of their license/certification under Tennessee law solely on the basis of that license or certification. *See* 42 U.S.C.A. § 300gg-5; 42 C.F.R. § 438.12. In addition, the Medicaid implementing regulations require that "provider selection policies and procedures . . . must not discriminate against particular providers that serve high-risk populations." 42 C.F.R. § 438.214(c).

56.69.  The Tennessee Code requires a Health Maintenance Organization ("HMO"), such as Amerigroup to promptly pay all Clean Claims.  Tenn. Code Ann. § 56-32-126. HMO's are also prohibited from retaliating against a provider in relation to challenging the denial of claims. Tenn. Code § 56-32-130.

57.70.  Dr. Sewell submitted Clean Claims for allergy testing services under CPT Code 95004 and allergen immunotherapy services under CPT Code 95165.  Dr. Sewell was the sole provider of these services and did not contract them out to any other provider. Moreover, auxiliary personnel who assisted Dr. Sewell are considered his employees when acting under his supervision under pursuant to CMS Pub. 100- 02, Ch. 15 ("Covered Medical and Other Health Services") § 60.1; Federal Register, Vol. 66, No. 212, at page 55267.  Additionally, the Provider Agreement does not require advance notice of use of

29

auxiliary personnel or forbid his use of their assistance in performing his own professional services.

58.71.  Because Amerigroup's denials of Dr. Sewell's Clean Claims violates federal and state statutes and regulations governing Amerigroup's disbursement of government funds, and because Amerigroup has ceased to reimburse Dr. Sewell for allergy care as it is both statutorily and contractually required to, an actual and justiciable controversy exists between Dr. Sewell and Amerigroup.

59.72.  Accordingly and pursuant to the federal declaratory judgment act, Dr. Sewell seeks a declaratory judgment that:

a.    Dr. Sewell provided allergy testing and allergen immunotherapy services that were within the scope of his license as a Tennessee physician and submitted Clean Claims for those services, which Amerigroup did not pay;

b.    Amerigroup's denials and prepayment review of Dr. Sewell's claims for reimbursement improperly discriminates against Dr. Sewell acting within the scope of his license;

c.    The Provider Agreement does not require Dr. Sewell to give notice of or seek approval from Amerigroup for contracts with suppliers of equipment or for use of auxiliary personnel, including technicians trained by UAS;

d.    Amerigroup does not have authority to sanction Dr. Sewell as claimed in its August 7 letter and in its notices of overpayment; and

e.    Amerigroup's reference to potential additional sanctions in its August 7 letter and its actions to seek recoupment are improper retaliation for disputing claims with Amerigroup.

30

## CLAIM TWO - BREACH OF CONTRACT

60.73.  Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

61.74.  The Provider Agreement is a valid, enforceable contract between the parties that provides for reimbursement of various services, including allergy care when medically necessary.

62.75.  Amerigroup has breached the Provider Agreement, including Sections 4.1 and 4.2, through Amerigroup's prepayment review and denials of Clean Claims submitted by Dr. Sewell.

63.76.  Amerigroup has also breached the Provider Agreement, including Section 3.4, through Amerigroup's imposing of "sanctions" to exercise control or direction over, the manner or method by which Dr. Sewell provides services to Covered Persons.

64.77.  Dr. Sewell has and will suffer damages from Amerigroup's breaches of the Provider Agreement in the amount of unreimbursed claims of at least $24,348.98 and additional lost profits exceeding $5001,000,000.00 as a result of Amerigroup's decision to refuse reimbursement to Dr. Sewell for the provision of allergy care.

## CLAIM THREE – VIOLATION OF TENNESSEE PROMPT PAYMENT ACT'S BAD FAITH REFUSAL TO PAY INSURANCE CLAIM, T. C. A. § 56-32-126(a)

65.78.  Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

66.79.  All of the Clean Claims that Amerigroup denied were submitted pursuant to the Provider Agreement and were fully due and payable at the time of submission.

67.80.  Dr. Sewell made numerous formal demands for payments of the denied Clean Claims.

31

68.81.  Dr. Sewell has waited more than sixty (60) days since making the first formal demand on December 16, 2016 to file this lawsuit.

69.82.  Amerigroup's refusal to pay these Clean Claims was not in good faith and its failure to pay inflicted additional expense on Dr. Sewell including attorney's fees in bringing this lawsuit. In particular, Amerigroup unjustifiably issued a carte blanche denial of allergy testing and immunotherapy claims provided by primary care physicians in a particular region and then failed to respond to calls or to provide any substantive response to Dr. Sewell's detailed explanations of the merits of his claims and as to why the denials were inappropriate. In addition, Amerigroup failed to request any additional information to investigate its denials following Dr. Sewell's detailed arguments in favor of paying the claims.

70.83.  Amerigroup's bad faith denial of the Clean Claims merits additional remedies under Sections 56-32-126 and 53-7-105 of the Tennessee Code, including an additional award in the amount of twenty-five percent (25%) of the liability for the loss Dr. Sewell incurred from all of Amerigroup's denials and recoupments of Dr. Sewell's allergy service claims including the amount of costs and attorney fees Dr. Sewell has incurred pursuing these claims.

## CLAIM FOUR – TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP OR ADVANTAGE

71.84.  Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

72.85.  Amerigroup's conduct described herein constitutes tortious interference with the business relationship between Dr. Sewell and third parties whom Amerigroup knows Dr. Sewell to be in a relationship with, including Dr. Sewell's patients, UAS, TennCare,

32

and Amerigroup's competitors. Amerigroup's conduct, which was neither justified nor privileged, was intended to cause those third parties to cease their agreements or business with Dr. Sewell or reduce performance or business with him.

73.86. Amerigroup's conduct constitutes willful and intentional acts of interference with those agreements and was done with malice and specific knowledge of the underlying contracts at issue and by improper means.

74.87. Such conduct caused injury to Dr. Sewell by, among other things, reducing business under Dr. Sewell's agreements and business relations causing a reduction in revenue and corresponding profits generated from these agreements and making it more difficult for Dr. Sewell and his practice to conduct their operations and business.

## CLAIM FIVE – SHERMAN ACT § 1 VIOLATION

**(Contract, Combination, or Conspiracy in Restraint of Trade
In Violation of Sherman Act, Section 1)**

75.88. Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

76.89. At all times relevant to the Complaint, Amerigroup has combined, conspired, or attempted to combine and conspire with its competitors and competitors of Plaintiffs, including managed care organizations and board-certified allergists to restrict competition for allergy testing and immunotherapy services in North Central Tennessee and other local areas within Tennessee. Amerigroup's actions includeAmerigroup explicitly agreed with Allergy, Asthma & Sinus Center, PME Communications, and Ned DeLozier that they would assist each other in taking efforts to restrict allergy testing and immunotherapy services to board-certified allergists including by Amerigroup not reimbursing for the same services provided by primary care physicians such as Dr. Sewell and by convincing other

33

health insurance companies to adopt the same illegal policy. Amerigroup's and its co-conspirators' agreement has resulted in restricting participation in the market for all allergy testing and immunotherapy services provided by businesses other than that of a board-certified allergist., especially for Amerigroup patients. In furtherance of their conspiracy, Amerigroup has agreed to engage in a coordinated campaign to boycott Dr. Sewell and other primary care physicians to drive them from the market. The campaign has included joint decisions sought with other managed care organizations and with allergists to restrict payment for allergy skin testing and immunotherapy services at the primary care level, including by falsely suggesting those services are "inappropriate," substandard, or fraudulent. Amerigroup has also attempted to coerce primary care physicians out of the market by falsely suggesting they are engaged in fraud or substandard care, and has attempted to push governmental investigators into false investigations to increase the appearance of that threat. In furtherance of its actual and threatened conspiracies and illegal agreements, Amerigroup has engaged in contact with competitor managed care organizations, board-certified allergists, and other third parties in an attempt to persuade, entice, or coerce them not to do business with Dr. Sewell or other primary care physicians, or to fix prices to competitively disadvantage then to discourage competition in the market.

77.90. Such conduct is considered illegal *per se* because such horizontal agreements threaten to successfully eliminate and restrict sources of output in the relevant market. Amerigroup and the two managed care organizations it attempted to enlist are horizontal competitors in Tennessee, and together hold a dominant position in the market for patients seeking allergy testing and immunotherapy and all health care services of TennCare members. Amerigroup's conspiracy and attempt at conspiracyAllergy, Asthma & Sinus

34

Center also holds a dominant position in the markets in Tennessee for allergy testing and immunotherapy and is conspiracy with Amerigroup seeks joint collaborative action to destroy legitimate competition in the market by encouraging a group boycott and fixing prices in an attempt to drive primary care physicians including Dr. Sewell out of the market. By refusing to pay anything for allergy testing and immunotherapy services and coercing primary care physicians to shut off output, Amerigroup seeksand its co-conspirators seek to deny Plaintiffs the ability to compete in the market. Amerigroup also seeks to cut off any technical capabilities of physicians to compete in the relevant market, including access to technical services and relationships necessary for allergy testing and immunotherapy including agreements with entities such as UAS. There are no plausible arguments that these anticompetitive effects are outweighed by any countervailing procompetitive benefits, so Amerigroup should not escape a *per se* designation.

78.91.  Strictly in the alternative to a *per se* designation, Amerigroup's anticompetitive actions justify an antitrust action under both a "quick-look" and full rule of reason analysis. The agreements Amerigroup has sought, entered, maintained, renewed and enforced have had the purpose and effect of eliminating competition for the provision of allergy testing and allergen immunotherapy and other healthcare services in the relevant market. As the result of Amerigroup's conduct, consumers have been deprived of the competition facilitated by Plaintiffs' participation in the relevant market, leaving many consumers with less access to care, lower output, and higher prices.

79.92.  Defendant's conspiracy to eliminate Plaintiffs and other primary care physicians from the markets for allergy testing and immunotherapy services has involved numerous acts in furtherance of their antitrust conspiracy, including the joint decisions to

35

deny all payments of all claims beginning in 2016, and to coerce physicians out of the market.

80.93. As a direct and proximate result of Defendant's past and continuing violations of the Sherman Act, Plaintiffs have suffered injury and damages in an amount to be proved at trial. These actual damages should be trebled under Section 4 of the Clayton Act, 15 U.S.C. § 15.

81.94. Plaintiffs also seek injunctive relief. The violations set forth above are continuing, are causing irreparable harm, and will continue unless injunctive relief is granted.

82.95. Plaintiffs also seek recovery of their attorneys' fees and costs under the Clayton Act as a remedy for the costs they have incurred as a result of Defendant's conduct.

### CLAIM SIX – DEPRIVATION OF FEDERAL RIGHTS IN VIOLATION OF 42 U.S.C. § 1983

83. Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein and allege the following claim strictly in the alternative.

84. 42 U.S.C. § 1983 provides that "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

85. Amerigroup, at all relevant times, purports to be acting at the behest of TennCare, and at times has held itself out as a state actor purporting to act under the color of Tennessee law.

86. 42 U.S.C. § 1396u-2, which applies to states operating a Medicaid program, provides: "A Medicaid managed care organization shall not discriminate with respect to participation . . . as to any provider who is acting within the scope of the provider's license or certification under applicable state law, solely on the basis of such license or certification."

87. This prohibition against provider discrimination has been interpreted by CMS, the agency authorized to promulgate rules and regulations necessary for the administration of Medicaid, to mean that a managed care organization's "selection policies and procedures . . . must not discriminate against particular providers that serve high-risk populations or specialize in conditions that require costly treatment."

88. At all relevant time, Amerigroup was a Medicaid managed care organization under the federal and state provisions described above.

89. 42 U.S.C. § 1396u-2's prohibition against provider discrimination, and that prohibition's interpretation in 42 C.F.R. § 438.214(c), is an enforceable right under 42 U.S.C. § 1983 because:

    a. it was clearly intended to benefit providers like Dr. Sewell;

    b. it places a binding obligation upon Amerigroup that is couched in mandatory terms;

    c. the provision, and the agency interpretation of that provision, provides a clear standard for judicial enforcement; and

    d. Congress has not explicitly foreclosed recourse to 42 U.S.C. § 1983 or established any remedial scheme sufficient to supplant § 1983 in this instance.

37

90.    To the extent Amerigroup claims it is acting under the color or protection of Tennessee state law, Amerigroup has deprived Dr. Sewell of the federal right guaranteed by 42 U.S.C. § 1396u-2(b)(7) by instituting and enforcing selection policies and procedures that discriminated against Dr. Sewell on the sole basis that Dr. Sewell was acting within the license or certification of physicians serving high-risk populations and/or specializing in conditions that require costly treatment. This deprivation was a violation of 42 U.S.C. § 1983.

**CLAIM SEVEN– VIOLATION OF FREE SPEECH GUARANTIES OF THE UNITED STATES AND TENNESSEE CONSTITUTIONS**

91.    Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein and allege the following claim strictly in the alternative.

92.    The First Amendment to the United States Constitution provides that the government shall not abridge the freedom of speech. This right is enforceable against state actors through the Fourteenth Amendment to the United States Constitution.

93.    The Tennessee Constitution provides a similar protection against abridgement of the freedom of speech.

94.    Amerigroup, at all relevant times, purports to be acting at the behest of TennCare, and at times has held itself out as a state actor purporting to act under the color of Tennessee law.

95.    Amerigroup's actions in adopting policies that improperly discriminate against the participation and reimbursement of Dr. Sewell, denying Clean Claims submitted by Dr. Sewell and threatening to exclude Dr. Sewell from the TennCare program were made for the purpose of retaliating against Dr. Sewell for filing a complaint with the Tennessee Department of Commerce and Insurance concerning Amerigroup's conduct.

38

96.     On June 20, 2017, Dr. Sewell made a complaint with the Tennessee Department of Commerce and Insurance concerning Amerigroup's conduct. Filing such a complaint constitutes protected free speech under the First Amendment to the United States Constitution and similar provisions of the Tennessee Constitution.

97.     Amerigroup's retaliatory conduct and actions represent adverse actions that would deter a person of ordinary firmness from continuing to engage in the aforementioned protected speech.

98.     Amerigroup's retaliatory conduct and actions were motivated by Dr. Sewell's protected speech described herein.

99.     To the extent Amerigroup claims it may or has acted under color of law, Amerigroup's retaliatory conduct and actions constitute intentional violations of Dr. Sewell's free speech rights under the First Amendment to the United States Constitution, Article One, Section Nineteen of the Tennessee Constitution, and Plaintiff's established rights under the United States Constitution in violation of 42 U.S.C. § 1983.

**APPLICATION FOR TEMPORARY AND PERMANENT INJUNCTIVE RELIEF**

~~100.~~96.Plaintiffs incorporate by reference all foregoing paragraphs as if fully alleged herein.

~~101.~~97.Amerigroup is violating Dr. Sewell's rights under the Provider Agreement by improperly sanctioning Dr. Sewell by denying all claims related to allergy services in which UAS is involved and by seeking to recoup past payments that Amerigroup made to Dr. Sewell related to such allergy services.

~~102.~~98.Dr. Sewell and his patients will suffer immediate and irreparable injury if Amerigroup is allowed to continue denying allergy services claims submitted by Dr. Sewell

or allowed to continue its efforts to recoup past payments, including interference with his ongoing treatment of his patients.

103.99.Amerigroup's actions will cause Dr. Sewell and his patients' immediate and irreparable damage for which Dr. Sewell does not have an adequate remedy at law. Currently hundreds of patients are going without treatment as a result of Amerigroup's conduct.

104.100.    To preserve the status quo until judgment in this cause is entered, Dr. Sewell hereby requests that the Court temporarily enjoin and restrain Amerigroup, and its agents, servants, employees and all persons acting under, and in concert with, or for them, through both a temporary restraining order and a temporary injunction, from (i) sanctioning Dr. Sewell by denying all claims related to allergy diagnosis, testing, treatment, preparation, and supervision services in which any auxiliary personnel provided assistance to Dr. Sewell in performing such services; (ii) seeking to recoup any past payments that Amerigroup has made to Dr. Sewell related to the allergy services that Dr. Sewell has provided; (iii) threatening to terminate the Provider Agreement or expel Dr. Sewell and his practice from the network, and (iv) communicating with Amerigroup's competitors about Dr. Sewell or allergy testing or immunotherapy reimbursement.

105.101.    Upon judgment in this cause, Dr. Sewell further requests that the Court permanently enjoin and restrain Amerigroup, and its agents, servants, employees and all persons acting under, and in concert with, or for them, from (i) sanctioning Dr. Sewell by denying all claims related to allergy diagnosis, testing, treatment, preparation, and supervision services in which any auxiliary personnel provided assistance to Dr. Sewell in performing such services; (ii) seeking to recoup any past payments that Amerigroup has

40

made to Dr. Sewell related to the allergy services that Dr. Sewell has provided; (iii) threatening to terminate the Provider Agreement or expel Dr. Sewell and his practice from the network, and (iv) communicating with Amerigroup's competitors about Dr. Sewell or allergy testing or immunotherapy reimbursement.

## **CONDITIONS PRECEDENT**

106.102.   All conditions precedent have been performed, have occurred, or have been excused.

## **JURY DEMAND**

107.103.   Dr. Sewell respectfully requests that all issues of fact in this case be tried to a properly impaneled jury.

## **PRAYER FOR RELIEF**

WHEREFORE, Dr. Sewell prays that the Court enter a declaratory judgment declaring:

a.    Dr. Sewell provided allergy testing and allergen immunotherapy services that were within the scope of his license as a Tennessee physician and submitted Clean Claims for those services, which Amerigroup did not pay;

b.    Amerigroup's denials of payment and prepayment review of Dr. Sewell's claims for reimbursement improperly discriminates against Dr. Sewell acting within the scope of his license;

c.    The Provider Agreement does not require Dr. Sewell to give notice of or seek approval from Amerigroup for contracts with suppliers of equipment or auxiliary personnel, including UAS;

d.    Amerigroup does not have authority to sanction Dr. Sewell as claimed in its August 7 letter; and

e.  Amerigroup's reference to potential additional sanctions in its August 7 letter and claims for overpayment are improper retaliation for disputing claims with Amerigroup.

That Dr. Sewell have and receive a judgment against Amerigroup for economic and actual damages caused to him and his medical practice including unreimbursed Clean Claims and lost profits in the amount within the jurisdictional limits of this Court together with interest thereon from January 2016 to the date of judgment.

That Dr. Sewell have and receive a judgment against Amerigroup for additional, punitive, statutory and exemplary damages for its bad faith and malicious conduct, including pursuant to the Clayton Act and T. C. A. § 56-32-126(a), in the additional amount treble damages or twenty-five percent (25%) of the liability for the loss Dr. Sewell incurred from all of Amerigroup's denials and recoupments of Dr. Sewell's allergy service claims including the amount of costs and attorney's fees Dr. Sewell has incurred pursuing these claims.

That the Court issue a temporary restraining order, temporary injunction, and later, a permanent injunction, enjoining Amerigroup from (i) sanctioning Dr. Sewell by denying all claims related to allergy diagnosis, testing, treatment, preparation, and supervision services in which any auxiliary personnel provided assistance to Dr. Sewell in performing such services; (ii) seeking to recoup any past payments that Amerigroup has made to Dr. Sewell related to the allergy services that Dr. Sewell has provided; (iii) threatening to terminate the Provider Agreement or expel Dr. Sewell and his practice from the network, or (iv) communicating with Amerigroup's competitors about Dr. Sewell or allergy testing or immunotherapy reimbursement.

42

Dr. Sewell further prays that the Court enter judgment also finding that Amerigroup is liable to Dr. Sewell for:

a. Costs of suit;

b. Prejudgment and post-judgment interest;

c. All other relief the Court deems appropriate.

Respectfully submitted,

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

/s/ *Casey Low*
Ashley E. Cowgill
Tennessee Bar Number 033042
333 Commerce Street
Nashville, TN 37201
Telephone: (615) 622-3708
Facsimile: (615) 622-3401
Ashley.cowgill@pillsburylaw.com


Casey Low
Texas Bar No. 24041363
Dillon J. Ferguson
Texas Bar No. 06911700
401 Congress Avenue, Suite 1700
Austin, Texas 78701
Telephone:  (512) 580-9600
Facsimile:  (512) 580-9601
casey.low@pillsburylaw.com
dillon.ferguson@pillsburylaw.com

**ATTORNEYS FOR C.S. SEWELL, M.D. P.C. AND CHRISTOPHER SEWELL, M.D.**

44

**CERTIFICATE OF SERVICE**

I hereby certify that on December 22, 2018, a true and correct copy of the foregoing document was sent via the CM/ECF system to the following:

Thomas H. Lee
FROST BROWN TODD LLC
1900 The Pinnacle at Symphony Place
150 3rd Avenue South
Nashville, TN 37201
tlee@fbtlaw.com

Martin J. Bishop
Brian F. Hendricks
Douglass G. Hewitt
REED SMITH LLP
10 South Wacker Drive
Chicago, IL 60606
(312) 207-2831
mbishop@reedsmith.com
bhendricks@reedsmith.com
dhewitt@reedsmith.com

/s/ *Casey Low*
Casey Low